UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: CR 07-1260 ABC |
| | ) | |
| Plaintiff, | ) | ORDER RE: MOTION TO SUPPRESS |
| | ) | EVIDENCE |
| v. | ) | |
| | ) | |
| SERGIO FELIX LOPEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pending before the Court is Sergio Felix Lopez's Motion to Suppress Evidence ("Motion"), filed on March 18, 2008. The Government filed an Opposition on March 24, 2008. The Motion came on for hearing on April 7, 2008. Upon consideration of the parties' submissions, testimony during the evidentiary hearing[1], and the arguments of counsel, the Court hereby **DENIES** Defendant's Motion.

### I. PROCEDURAL HISTORY

On November 13, 2007, the Government indicted Sergio Felix Lopez ("Defendant") on three counts: (1) firearm possession in violation of

---

[1] The following witnesses testified at the evidentiary hearing: Los Angeles Police Department Officers Leslie Perez and Rene Banuelos, and Defense investigator Armando Cruz.

1  18 U.S.C. § 922(g)(1); (2) possessing with intent to distribute 4.05

2  grams of a mixture or substance containing a detectable amount of

3  cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c);

4  and (3) possessing a loaded firearm in furtherance of a drug

5  trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

6  Defendant now moves to suppress evidence obtained in connection with

7  his stop, detention, and arrest on September 16, 2007.

8                    **II.   FACTUAL BACKGROUND**

9       On September 16, 2007, at approximately 3:43 a.m., Los Angeles

10 Police Department ("LAPD") Officers Leslie Perez and Rene Banuelos

11 received a call from LAPD dispatch regarding a possible burglary at an

12 apartment complex in the Northridge area. (Perez Decl. ¶¶ 2-3.)[2]  The

13 call directed the officers to make contact with a security guard at

14 the Park Parthenia Apartments complex ("Park Parthenia"). (Id. ¶ 3.)

15 There is only one entrance to Park Parthenia, located on its northern

16 side at a gate that obstructs Vanalden Avenue. (Id. ¶ 4.)  LAPD

17 officers who patrol that area understand Park Parthenia to be a

18 dangerous complex that is often the site of gang and narcotics

19 trafficking activities. (Id. ¶ 5.)  One neighborhood gang, known as

20 "Bryant Street," operates almost exclusively within Park Parthenia and

21 claims the portions of Bryant Street that lie within the complex's

22 grounds as its territory. (Id. ¶ 5.)

23

24       [2]  Citations herein are to Officer Perez's declaration.  The

25 Court notes for the record that Officer Perez's and Officer Banuelos's
   testimonies at the evidentiary hearing were consistent with Perez's

26 declaration and with each other.  The only discrepancies between their
   testimonies – such as how long Defendant was driving with his

27 vehicle's lights deactivated – were marginal and did not undermine
   either officers' credibility on the key facts supporting probable

28 cause.

1        Officers Perez and Banuelos arrived, in a marked LAPD cruiser, at

2  the main security building at Park Parthenia at approximately 4:00

3  a.m.  (Id. ¶ 6.)  A security guard informed them that a Park Parthenia

4  resident had complained of hearing someone breaking the window to the

5  resident's apartment.  (Id. ¶ 7.)  The guard indicated that the

6  resident was located somewhere towards the eastern end of the complex

7  along Bryant Street.  (Id.)

8        Officers Perez and Banuelos drove along Vanalden Street and then

9  Bryant Street, looking for evidence of a broken window or other

10  indicia of a burglary suspect or suspects.  (Id. ¶ 8.)  When they

11  reached the end of Bryant Avenue, the officers turned their cruiser

12  around and started driving back toward Vanalden Avenue.  (Id.)

13        Shortly after they had turned their cruiser around, the officers

14  spotted a dark, sport-utility type of vehicle enter the complex and

15  proceed down Vanalden Avenue, then turn right onto Bryant Street.

16  (Id. ¶ 9.)  Defendant was the driver of the vehicle.  As the vehicle

17  turned onto Bryant Street, the driver deactivated all of the vehicle's

18  exterior lights.  (Id.)  While the vehicle lights were off, the driver

19  then proceeded approximately 50-75 yards[3] down Bryant Street then

20  turned into a parking lot.  (Id.)[4]

21

22          [3]  At the evidentiary hearing, Defense investigator Cruz

23  testified that he measured the distance the vehicle traveled with its
lights off, and determined that it is approximately 669 feet.

24

25          [4]  Defendant's account, set forth in his declaration submitted
with the Motion,  differs.  He denies driving with the vehicle's
lights on, and states that it was only after he parked his vehicle

26  that he turned off the lights.  As such, the Court is called upon to
make a credibility determination.  Having observed the officers at the

27  evidentiary hearing, and having considered the totality of their
testimonies and the evidence, the Court finds the officers more

28  credible.

As the vehicle turned down Bryant Street, Officers Perez and Banuelos became suspicious and decided to stop the vehicle. (_Id_. ¶ 11.)  The officers suspected that the vehicle's driver might have been engaged in criminal activity, given the lateness of the hour, the darkness, the notoriety of the Park Parthenia complex, and the fact that the driver switched off his lights as he turned onto Bryant Street.  (_Id_. ¶ 11.)  The officers also believed that the driver's actions violated California Vehicle Code provisions prohibiting drivers from operating their vehicles without their lights turned on during hours of darkness.  (_Id_. ¶ 10.)

Before the officers could initiate a stop, the driver (now suspect) turned left off Bryant Street into a parking lot adjoining 19154 Bryant Street.  (_Id_. ¶ 13.)  Officer Banuelos pulled into the parking lot behind the suspect and parked the cruiser so that it was facing the suspect's vehicle.  (_Id_.)  The officers then left their cruiser and Officer Banuelos began walking toward the driver side while Officer Perez walked toward the passenger side.  (_Id_. ¶ 15.)  The officers noticed that the vehicle contained a single male occupant.  (_Id_. ¶ 14.)

Officer Banuelos approached the suspect and began asking him for identification, insurance, and registration documents.  (_Id_. ¶ 16.)  At the same time, Officer Perez inspected the interior of the vehicle with her flashlight.  (_Id_. ¶ 17.)  As she did so, she noticed the entire butt-end of a revolver's handle sticking out of the rear pouch of the front passenger seat.  (_Id_.)  Upon seeing this, Officer Perez immediately told Officer Banuelos that they had to remove the suspect from the vehicle.  (_Id_.)

Officer Banuelos then ordered the suspect to leave the vehicle. (Id. ¶ 18.)  The officers handcuffed the suspect and placed him inside the cruiser.  (Id.)  While the suspect sat handcuffed inside the cruiser, Officer Perez went inside the vehicle and retrieved a .357 revolver containing five rounds from the rear pouch of the vehicle's front passenger seat.  (Id. ¶ 19.)

As she continued to search the car, Officer Perez asked the suspect if there was anything else that the officers would find inside the vehicle.  (Id. ¶ 20.)  The suspect said "no," but Officer Perez asked him why they should believe that answer.  (Id.)  The suspect then stated "I have to carry it for protection," or words to that effect.  (Id.)  Officer Perez then began taking field information from the suspect, and asked him a series of standard LAPD field interview questions, including his name and if he had any gang aliases or affiliation.  (Id. ¶ 21.)  The suspect identified himself as Sergio Felix Lopez and stated that the belonged to "Bryant" and that his gang alias was "Ripples."  (Id.)  Officer Banuelos then radioed LAPD dispatch and provided it with Defendant's name.  (Id. ¶ 23.)  LAPD dispatch responded that Defendant was "Code 6 - Charlie," which Officer Perez understood to mean that the LAPD database had identified Defendant as under an active arrest warrant or parole status, thus giving the officers reason to believe that Defendant could not lawfully possess a concealed weapon.  (Id. ¶ 25.)

Officer Perez asked defendant if there was anything else on his person or in the vehicle that the officers should know about, to which defendant responded "I only have dope on me, nothing in the vehicle," or words to that effect.  (Id. ¶ 24.)  Officer Perez asked defendant where on his person the narcotics were located, and he answered that

it was in his shoe.  (<u>Id</u>.)

While the suspect remained handcuffed inside the cruiser, LAPD Officers Herrera and Holzer arrived at the scene.  (<u>Id</u>. ¶ 25.) Officer Banuelos told Officer Holzer that defendant said that he had narcotics in one of his shoes; Officer Holzer then asked defendant which shoe defendant was referring to.  (<u>Id</u>. ¶ 26.)  Defendant said that the narcotics were in his left shoe, and Officer Holzer asked him to kick that shoe off of his foot.  (<u>Id</u>.)   As his shoe came off, Defendant stated "there it is," and the officers recovered a rock-like substance wrapped in a white paper.  (<u>Id</u>.)  The officers then decided to arrest Defendant on suspicion of violating narcotics and firearms laws.  (<u>Id</u>. ¶ 27.)  They read Defendant his <u>Miranda</u> warnings, in response to which Defendant immediately invoked his right to remain silent.  (<u>Id</u>.)

Defendant seeks to suppress all evidence collected against him during the September 16, 2007 arrest on the ground that the officers' conduct violated Defendant's Fourth Amendment rights as follows:

1.   The officers did not have probable cause to stop, detain and/or order Defendant out of his vehicle.

2.   The officers did not have probable cause to search Defendant's vehicle.

3.   The officers did not have consent to enter and/or search Defendant's vehicle.

4.   The officers did not have probable cause to arrest Defendant.

5.   The officers did not have probable cause to conduct a search of Defendant's person.

1     Although Defendant contends that each of the officers' actions
2 was unconstitutional, his primary argument is that the initial stop
3 was pretextual and wholly lacking in probable cause, and therefore
4 unlawful.  Based upon the alleged unconstitutionality of the stop,
5 Defendant argues that all of the officers' subsequent conduct was
6 unconstitutional.  The Government opposes the motion, arguing that
7 each of the officers' actions was supported by the required standard
8 of reasonable suspicion or probable cause.

9     **III.   DISCUSSION**

10 **A.   The Officers' Stop was Supported by Probable Cause that Defendant**
11     **Was Violating Traffic Laws.**

12     The Fourth Amendment to the United States Constitution protects
13 citizens from unreasonable searches and seizures.  An investigatory
14 stop need not be supported by probable cause in order to comport with
15 the Fourth Amendment.  Instead, an officer may perform such a stop if
16 he or she has a reasonable and articulable suspicion that a suspect
17 has committed a criminal offense.  See Terry v. Ohio, 392 U.S. 1, 21
18 (1968); Hayes v. Florida, 470 U.S. 811, 816 (1985).  A traffic stop
19 like the one in issue here is an investigatory stop.  See, e.g.,
20 United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000)
21 ("[T]he Fourth Amendment requires only reasonable suspicion in the
22 context of traffic stops."); United States v. Rojas-Millan, 234 F.3d
23 464, 468-69 (9th Cir. 2000) (officer had reasonable suspicion to
24 believe automobile's license plate was fake after running plate number
25 twice and finding no match).

26     Here, Officer Perez stated that she and Officer Banuelos decided
27 to stop Defendant because they witnessed him operating his vehicle in
28 darkness without its lights illuminated.  California Vehicle Code

1  section 24250, "Lighting During Darkness," states that"During
2  darkness, a vehicle shall be equipped with lighted lighting equipment
3  as required for the vehicle by this chapter."  Defendant argues that
4  this provision requires only that the vehicle be equipped with
5  lighting equipment, not that that lighting equipment be lit, while the
6  car is in operation during darkness.  That reading, however, is not
7  supported by the clear – if inelegant – language of the statute which
8  plainly states that such a vehicle "shall be equipped with **lighted**
9  lighting equipment . . ."  (emphasis added.)  Because Defendant was
10 violating this provision, the officers were justified in stopping him:
11 they had more than reasonable suspicion that Defendant was violating a
12 traffic law.  See, e.g., Whren v,. United States, 517 U.S. 806, 810
13 (1996) ("As a general matter, the decision to stop an automobile is
14 reasonable where the police have probable cause to believe that a
15 traffic violation has occurred.")

16     Nor are Defendant's references to United States v. Freeman, 209
17 F.3d 464 (6th Cir. 2000) and United States v. Gregory, 79 F.3d 973
18 (10th Cir. 1996) persuasive.  Defendant relies on these cases for the
19 argument that stopping Defendant after what he characterizes as a *de*
20 *minimis* (if any) violation of the California Vehicle Code was not
21 "reasonably related in scope to the circumstance which justified the
22 interference in the first place," as required by Terry v. Ohio, 392
23 U.S. 1, 19-20 (1968).  Freeman and Gregory involved motorists who made
24 single, momentary incursions into the emergency lane.  Both courts
25 found such conduct insufficient to give rise to probable cause for a
26 traffic violation where the statutes in issue required drivers to
27 drive "as nearly as practicable" entirely in a single lane.  See,
28 e.g., Gregory, 79, F.3d 978.  Here, by contrast, the officers

8

1  witnessed Defendant <u>turn</u> <u>off</u> his vehicle's lights, then continue

2  driving for at least 50-75 yards along a public street, a substantial

3  distance creating a more than momentary violation.  Furthermore,

4  unlike the statutes in <u>Gregory</u> and <u>Freeman</u> requiring drivers to keep

5  within a single lane "as nearly as practicable," section 24250 of the

6  Vehicle Code establishes a bright-line rule that a driver <u>shall</u> drive

7  with <u>lighted</u> lighting equipment.  Defendant's violation of section

8  24250 was immediately apparent when he turned off his vehicle's lights

9  while driving in darkness and continued driving.

10     Finally, Defendant also speculates that his stop was wholly

11 pretextual.  However, pretextual traffic stops based on objective

12 probable cause do not violate the Fourth Amendment.  See <u>Whren v.</u>

13 <u>United States</u>, 517 U.S. 806 (1996).  The Ninth Circuit has held that

14 the subjective intentions of law enforcement officials are not

15 relevant where probable cause exists to support the police action.

16 See <u>United States v. Hudson</u>, 100 F.3d 1409, 1416 (9th Cir. 1996),

17 <u>cert.</u> <u>denied</u>, 522 U.S. 939 (1997)("<u>Whren</u> stated unequivocally that

18 officers' subjective motives are not relevant where probable cause

19 exists to support a particular police action.").  See also <u>United</u>

20 <u>States v. Ibarra</u>, 345 F.3d 711, 714 (9th Cir. 2003), <u>cert.</u> <u>denied</u>, 124

21 S. Ct. 1464 (2004)("If nothing else, <u>Whren</u> foreclosed the possibility

22 that a search or seizure may be invalidated solely because of the

23 subjective intentions of a state officer.").

24     Accordingly, because Defendant was committing a traffic violation,

25 the officers had probable cause to subject him to an investigatory

26 stop.

27 //

28 //

**B.   The Officers Also Had Reasonable Suspicion to Believe Defendant Was Involved in Criminal Activity.**

In addition to probable cause to believe Defendant violated traffic laws, the officers had reasonable suspicion to believe that Defendant was involved in criminal activity.  An officer's determination of reasonable suspicion must appear justified "from the totality of the circumstances . . . [from which an] inference of criminal conduct [may be] based on specific, articulable facts." United States v. Michael P., 90 F.3d 340, 346 (9th Cir. 1996).  The facts are to be interpreted in the light of a trained officer's experience.  United States v. Cortez, 449 U.S. 411, 418 (1981).  This includes the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers." Hall, 974 F.2d at 1204 (quoting United States v. Sharpe, 470 U.S. 675, 682 (1985).  No single factor is dispositive in the analysis, and all factors must be considered together.  Even factors that appear innocent in isolation may, under a totality of the circumstances, give rise to a reasonable suspicion that an individual is engaged in criminal conduct.  Michael P., 90 F.3d at 346.  Both the time of day of the conduct, and an area's reputation as a high-crime area may have significance under the totality of the circumstances.  Id. at 347; Unites States v. Mayo, 394 F.3d 1271, 1275 (9th Cir. 2005) (holding that officer's stop was justified by reasonable suspicion where the defendant looked to be carrying out a drug transaction in an area known for heavy drug activity.)

Here, Officers Perez and Banuelos stopped defendant between 4:15 and 4:30 a.m., a time when few other persons would be active in the area, after Defendant turned off the lights of his vehicle upon

1  turning onto Bryant Street, and continued driving at least another 50-
2  75 yards.  Based on their training, the officers understand the
3  turning off of vehicle lights to be a common precursor to criminal
4  activity.  (Perez Decl. ¶ 11.)  Second, among the LAPD, the Park
5  Parthenia complex is notorious as the site of gang and narcotics-
6  related activities.  (Perez Decl. ¶ 5.)  Defendant's conduct turning
7  off his vehicle lights yet continuing to drive, in the darkness, at
8  4:15-4:30 a.m., in a complex known for gang and drug-related crime,
9  gives rise to a reasonable and articulable basis for the officers to
10  suspect that Defendant was engaged in criminal conduct.

11  **C.   The Officers' Observation and Recovery of the Handgun Was**
12  **Justified.**

13      The Fourth Amendment does not prevent officers from observing and
14  seizing, without a warrant, items that are in plain view during the
15  course of an otherwise lawful search.  <u>Texas v. Brown</u>, 460 U.S. 730,
16  738-39 (1983) ("if, while lawfully engaged in an activity in a
17  particular place, police officers perceive a suspicious object, they
18  may seize it immediately.")  To come within the "plain-view" exception
19  to the Fourth Amendment, the officer must have a prior justification
20  for an intrusion in which he came across the evidence, and the
21  incriminating character of the evidence must be immediately apparent.
22  <u>Horton v. California</u>, 496 U.S. 128, 135-137 (1990); <u>see also</u> <u>United</u>
23  <u>States v. Good</u>, 780 F.2d 773, 775 (9th Cir. 1986).

24      Here, the investigatory stop was supported by probable cause and
25  reasonable suspicion, as discussed above.  Accordingly, the officers
26  had a prior justification for their intrusion of stopping Defendant.
27  Furthermore, Officer Perez needed no justification beyond her lawful
28  presence to use her flashlight to illuminate the interior of

1  Defendant's car.  Brown, 460 U.S. at 739-740 (stating, "It is likewise
2  beyond dispute that [the officer's] action in shining his flashlight
3  to illuminate the interior of [defendant's] car trenched upon no right
4  secured to the latter by the Fourth Amendment.  The Court said in
5  United States v. Lee, 274 U.S. 559, 563 (1927), that '[The] use of a
6  searchlight is comparable to the use of a marine glass or a field
7  glass. It is not prohibited by the Constitution.'  Numerous other
8  courts have agreed that the use of artificial means to illuminate a
9  darkened area simply does not constitute a search, and thus triggers
10  no Fourth Amendment protection.")  Accordingly, Officer Perez's
11  looking into the vehicle and viewing the gun did not violate
12  Defendant's Fourth Amendment rights.  The suspicious nature of the
13  handgun was also immediately obvious to the officers both because
14  Officer Perez immediately identified the item as a handgun, and
15  because they had probable cause to believe Defendant was engaged in
16  criminal activity.

17      After Officer Perez observed the handgun, the officers decided to
18  remove Defendant from the car.  They did so by ordering him out of the
19  vehicle, handcuffing him, and placing him inside their police cruiser.
20  This action was justified because the fficers had reasonable suspicion
21  to believe Defendant may have been involved in criminal activity, and
22  the forward placement of the passenger seat placed the gun within
23  Defendant's easy reach.  As discussed above, "It is well settled that
24  when an officer reasonably believes force is necessary to protect his
25  own safety or the safety of the public, measures used to restrain
26  individuals, such as stopping them at gunpoint and handcuffing them,
27  are reasonable."  Alexander v. County of Los Angeles, 64 F.3d 1315,
28  1320 (9th Cir. 1995).  Under the totality of the circumstances, the

1    officers' belief in the need to protect their own safety by removing
2    and restraining Defendant was reasonable.
3    **D.   The Officers' Seizure of the Handgun And Arrest of Defendant was**
4         **Justified**
5         After removing Defendant from the vehicle, Officer Perez
6    inspected the handgun and saw that it was loaded.  Thereafter, the
7    officers asked Defendant for his name and other identifying
8    information; Defendant responded to the effect that he belonged to the
9    Bryant Street gang.  Thereafter, the officers learned from LAPD
10   dispatch that Defendant was either under an active arrest warrant or
11   on parole.  The officers seized the gun and, shortly thereafter,
12   placed Defendant under arrest.  Both of these acts were justified by
13   probable cause.  Upon learning that Defendant was either under a
14   warrant or on parole, the officers had probable cause to believe that
15   Defendant was violating sections of the California Penal Code
16   prohibiting those with felony and certain misdemeanor convictions, and
17   those under parole, from carrying concealed weapons.  See Cal. Penal
18   Code §§ 12021, 12025.  Accordingly, the officers had probable cause
19   both to arrest Defendant and to seize the weapon.
20        It was also lawful for the officers to ask Defendant certain
21   routine, identifying information prior to issuing the Miranda warning
22   because such questions are not considered interrogatory.  This
23   includes not only a suspect's name, age, and address, but also gang
24   monikers.  See, e.g., United States v. Washington, 462 F.3d 1124,
25   1132-1133 (9th Cir. 2006) (holding that FBI agents' asking a suspect
26   his gang moniker prior to giving him Miranda warning does not violate
27   the suspect's right to counsel, and stating that such information is
28   no different from other identifying information).  As such, the Court

1   will not suppress Defendant's response to those questions.

2   **E.   The Officers' Search of Defendant Person and Their Recovery of**

3         **Cocaine was Justified.**

4       Officer Perez also asked Defendant whether there was anything

5   else in the vehicle or on his person that they should know about, to

6   which Defendant replied, "I only have dope on me, nothing in the

7   vehicle." (Perez Decl. ¶ 24.)  Officer Perez asked where the dope

8   was, and Defendant said it was in his shoe. (<u>Id</u>.)  Officer Holzer

9   arrived and asked Defendant which shoe the narcotics were in, and

10  Defendant responded, "My left shoe." (<u>Id</u>. ¶ 26.)  Officer Holzer

11  asked Defendant to kick off his left shoe; Defendant did so. (<u>Id</u>.)

12  As the shoe came off, Defendant said, "There it is," at which point

13  Officer Holzer removed from the shoe a white paper containing a rock-

14  like substance that resembled cocaine. (<u>Id</u>.)

15      Among the exceptions to the Fourth Amendment's prohibition of

16  warrantless searches is the exception for a search incident to arrest.

17  The search-incident-to-arrest exception permits law enforcement

18  officers to conduct a warrantless search of a person who is arrested,

19  and of his surrounding area, when the search is incident to the

20  arrest. <u>Chimel v. California</u>, 395 U.S. 752, 762-63 (1969).  Such

21  searches have long been considered valid, despite the absence of a

22  warrant, because of the need to remove any weapons that threaten the

23  arresting officers or bystanders and the need to prevent concealment

24  or destruction of evidence. <u>Chimel</u>, 395 U.S. at 763.  So long as an

25  arrest that follows a search is supported by probable cause

26  independent of the fruits of the search, the precise timing of the

27  search is not critical. <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 111

28  (1980); <u>United States v. Morgan</u>, 799 F.2d 467, 469 (9th Cir.1986); <u>see</u>

 1 | also <u>United States v. Potter</u>, 895 F.2d 1231, 1234 (9th Cir. 1990)
 2 | (finding no Fourth Amendment violation for pre-arrest "pat down"
 3 | search of suspect based on probable cause to arrest, and noting that
 4 | "[a] search incident to an arrest is valid whether it occurs
 5 | immediately before or after the arrest.").

 6 |      Here, as discussed above, the officers had probable cause to
 7 | arrest Defendant for unlawful possession of a concealed weapon.
 8 | Moments before actually arresting him, but after they had probable
 9 | cause to do so, the officers searched Defendant.  Their search
10 | consisted of asking Defendant where on his person the narcotics were
11 | and asking him to remove the shoe containing the narcotics.  This
12 | search was roughly contemporaneous with the arrest, as required by
13 | Supreme Court and Ninth Circuit precedent, and thus falls within the
14 | search-incident-to-arrest exception to the Fourth Amendment.  The
15 | cocaine the officers found in Defendant's shoe was therefore recovered
16 | in the course of a lawful search.  Therefore, the Court will not
17 | suppress this evidence.

18 |
19 |                 **IV.   CONCLUSION**
20 |      For the foregoing reasons, the Court **DENIES** Defendant's Motion to
21 | Suppress Evidence.

22 |
23 | **SO ORDERED**
24 | **DATED:**      **April 8, 2008**      _____
25 |                     **AUDREY B. COLLINS**
26 |             **UNITED STATES DISTRICT JUDGE**
27 |
28 |